**SEIBERLING RUBBER COMPANY, Appellant, v. EVATT, Tax Commr., Appellee.**

Board of Tax Appeals.

No. 3966.   Decided March 16, 1944.

J. W. Dessecker, Akron, for appellant.

Thomas J. Herbert, Atty. Genl., Perry L. Graham and Aubrey A. Wendt, Columbus, for appellee.

## ENTRY

This cause came on to be heard upon the appeal of the Seiberling Rubber Company from certificates of assessment made by the tax commissioner for the years 1938 and 1939. Said cause was heard upon the transcript of proceedings

before the tax commissioner, the evidence and arguments and briefs of counsel. The errors claimed in said assessments are as follows:

1. The tax commissioner erroneously disallowed as deductions from credits for the years 1938 and 1939 the sums of $16,374.75 and $38,478.36, respectively, out of the reserves set up and claimed by appellant.

2. The tax commissioner erroneously denied appellant permission to correct its returns (which were consolidated returns) for said years by including returns for one of its subsidiaries in which it owned more than 51% of the common capital stock, said returns having been omitted in said consolidated returns.

3. The tax commissioner erroneously disallowed as current accounts payable certain gold debentures in the sum of $2,350,000.

4. The tax commissioner did not include as accounts payable the amounts of checks issued but not yet paid as of October 31, 1937, and October 31, 1938 (the fiscal years ending October 31), in the amounts of $125,616.70 and $319,151.15, respectively, which appellant did not include as accounts payable in its returns.

The second assigned error will be considered last.

With reference to the first claimed error, appellant in its returns for the years 1938 and 1939 deducted from notes and accounts receivable its book reserves for bad debts in the amounts of $317,203.33 and $160,610.46, respectively. The tax commissioner having determined that the returns of appellant for said years were incorrect, set forth in his amended correction sheets the following deductions from accounts and notes receivable:

|  | TAX YEARS | |
| --- | --- | --- |
|  | 1938 | 1939 |
| Bad Debt Allowances | | |
| Reserve Seiberling Acceptance Corp. 3½% trade accounts and notes receivable less old accounts and dealer's bonus due (1938—$1,744,982.00 | 2,767.96 | 2,358.75 |
| (1939—$1,539,133.00) | 61,074.00 | 53,870.00 |
| Old Accounts | 172,561.25 | 27,651.64 |
| Dealer's bonus due | 67,203.33 | 40,610.46 |
|  | 303,606.54 | 124,490.85 |

Appellant claims that the tax commissioner in determining the amount that should be allowed for bad debts, after making allowances for old accounts and dealer's bonuses, set up only 3½% of trade accounts and notes receivable and disallowed the book reserves set up by appellant. The question, therefore, is whether the action of the tax commissioner in his determination of the true value of the accounts receivable in money was correct. **Sec. 5389 GC** of Ohio provides in part:

"In the case of accounts receivable, the book value thereof less book reserves, if any, shall be listed and shall be taken as the true value thereof unless the assessor shall find that such net book value is greater or less than the then true value of such accounts receivable in money."

**Sec. 5375 GC** also says:

"Wherever any taxable property is required to be assessed at its true value in money or at any percentage thereof, the assessor shall be guided by the statements contained in the taxpayer's return and such other rules and evidence as will enable him to arrive at such true value."

Appellant claims that the percentage figure of 3½% was arrived at by dividing the actual charge to bad debt reserve for the five years immediately preceding each tax year involved by the sales for the same period, whereas appellant used the same method except that in computing such percentage figure for the year 1938 it used the average for the period from November 1, 1929, to November 1, 1937, resulting in a percentage figure of 4.095, and for the year 1939 it used the average for the period from November 1, 1929, to November 1, 1938, resulting in a percentage figure of 3.859. The number of years used by the appellant in each case in determining the average ratio of bad debts to actual sales included depression years in which it is generally known that such losses were considerably larger than in normal years. This is shown by the fact that in the latter case, which included the same depression years and added one normal year, the average percentage was nearly one-fourth of a percent smaller than in the former case. It would seem that a fairer average percentage would be arrived at in determining bad debt reserves for said two years by using appellant's experience during the period of five years next preceding the years involved. While the appellant may not have applied its percentage figures to

accounts receivable it nevertheless used them as a factor in determining the amount required for debt reserves. Appellant says in its reply brief:

"It is true the **reserve percentages** were arrived at in the same manner—that is by dividing the bad debt losses for certain periods by the sales for the same period, but the use of the percentages thus obtained by the Appellant and by the Commissioner, was completely different.

"Appellant (See page 7 of Report) set-up each month as a reserve, a percentage of **sales** and at the end of the year made adjustments after careful analysis of each individual account on its book, by auditors and members of its credit and collection department."

The evidence does not show to what extent such percentages were a factor in setting up bad debt reserves. If they were the major factor and if the appellant had used the same percentages as did the tax commissioner, as well as the other analysis which it says it used, there would probably be little difference between the reserves it had arrived at and the bad debt allowances made by the tax commissioner. At any rate there is no evidence that the reserves in the amounts of the tax commissioner's allowances for bad debts were insufficient to cover losses for said years. Appellant also claims that the tax commissioner, in addition to bad debts, old accounts and dealer's bonuses, should have made deductions for cash discounts, advertising and adjustment allowances and collection expenses. Appellant made no claim for such deductions in writing or otherwise at the time it filed its return, did not include such items in its return and had not set up any reserve therefor in its books. **Sec. 5389 GC**, provides that:

"Claim for any deduction from net book value of accounts receivable or depreciated book value of personal property must be made in writing by the taxpayer at the time of making return."

Moreover, there is no evidence to show that the allowances made by the tax commissioner as deductions from accounts receivable were insufficient for a reserve to cover all items claimed by the appellant. If said allowances were actually insufficient the appellant could have shown it at the time of the hearing. Upon the record that is before it

the board finds that the determination of the tax commissioner was correct. The board of Tax Appeals, therefore, finds that the tax commissioner did not err in said assessments and in this respect the assessments complained of in this appeal are affirmed.

With reference to the third claimed error, notes were originally issued by appellant to group banks on various dates from January 28 to February 24, 1930, aggregating in amount $3,100,000.00. The terms of the original notes and first renewals were payable in less than a year from their dates. On May 15, 1930, 6% gold debentures in the total sum of $3,100,-000.00 were issued by appellant and with the proceeds it paid all of said notes. Said debentures were payable to the Guaranty Trust Company of New York as trustee, or to bearer. Payment of interest on and principal of debentures of Class A was guaranteed by Frank A. Seiberling. Debentures of Class B were subordinate to those of Class A. Said debentures were secured by an indenture dated May 15, 1930, and entered into between appellant and Guaranty Trust Company of New York, Edgar B. Davis and Howard I. Shepherd as trustees, and Edgar B. Davis as pledgor of certain collateral. Said debentures were redeemable prior to their maturities and in the event of default, as defined in the indenture, could be declared to be due prior to maturity. Said debentures matured November 15 of the years 1931, 1932 and 1933. The option of redemption was not exercised nor were said debentures paid prior to their maturities.

The debentures maturing November 15, 1931, having been paid, the time for payment of those falling due November 15, 1932, was extended by agreement on said date of November 15, 1934. On November 15, 1933, the time for payment of the debentures falling due on said date was extended by agreement to November 15, 1935. Again by extension agreement on January 8, 1937, the time for the debentures expressed to mature November 15, 1932, was extended to November 15, 1936, and all those expressed to be due was extended to November 15, 1937. On March 20, 1938, the time for payment of all of said debentures was extended to November 15, 1938. Said debentures had not been redeemed nor had they been paid at the time of the filing of appellant's returns.

It is clear that the original indebtedness being payable within one year from date of inception was then a current account payable. **Sec. 5327 GC.** That same indebtedness existed until about May 15, 1930, when said notes were discharged.

At that time the indebtedness on the notes was extinguished and a new indebtedness was created by the issuance of gold debentures payable to other than the payees of the notes. The payees of the debentures, the holders thereof, became creditors of appellant and the original creditors were paid in full. The following is stated in **30 O. Jur. 275**:

"Thus, the substitution of a new creditor and the discharge of the debtor to the old is a novation."

Since said debentures all had maturities of more than one year from the date of inception they can not be considered current accounts payable. The fact that appellant could redeem them prior to maturity or that they could be declared to be due in the event of certain defaults does not make them current accounts payable within the meaning of this term as used in said statute. The board is of the opinion that the term "payable" refers to a time when it is certain that the debentures are to be due and not to a time of the happening of a particular event which may or may not occur. If the appellant complies with the provisions of the debentures and indenture the holder thereof cannot cause them to become due prior to their stated maturity. The word "due" is equivalent to "payable". Ball v Northwest Mutual Accident Association, 56 Minnesota, 444 at 449; 57 N. W. 1263 at 1264. "The word 'payable' when used in promissory notes and other commercial transactions means ordinarily 'to be paid', rather than which may be paid." State v Columbus State Bank, 124 Nebraska 231, 246 Northwestern 235 at 236. The Board is also of the opinion that the fact that from time to time there were agreements supported by a consideration of extensions of time for payment of said debentures did not constitute the creation of a new indenture in place of the old. There were not even any renewals or change of the evidence of indenture. The original debentures were still outstanding and the appellant was bound to pay them. As stated in **Murphy Savings and Trust Company v Lyder, 9 Abs 20,**

"Renewing a note from time to time in no way extinguishes the original debt, but is simply an extension of time of payment and a change as to the evidence of the debt."

Therefore, the Board of Tax Appeals finds that the tax commissioner did not err in not including said debentures as

current accounts payable and in this respect the assessments complained of in the appeal are affirmed.

The fourth assignment of error is the disallowannce of the amounts of checks issued by appellant, but not yet paid at the close of the fiscal years October 31, 1937, and October 31, 1938. It is true that the mere issuance of a check does not operate as an assignment of money in the drawee bank and, therefore, such check is not to be deducted from the bank deposit returned for taxation. However, it seems to be well settled that as between the payer or payee a check delivered to and accepted by the payee constitutes payment of the debt for which it was given at the time of its delivery if the check is paid in due course. As stated in 48 C. J. 618,

"Where a check delivered to a creditor, although without any agreement or covenant on his part to receive it as absolute payment, is in fact paid in due course, the debt is discharged pro tanto, as of the time at which the check was received: * * * "

"In general mercantile and commercial transactions a check, after all, is but a convenient form of transferring money, and operates either as payment absolute or payment conditional, as the parties themselves intend. * * * But in all such transactions where a check is received as conditional payment the payment becomes absolute and relates to the delivery of the check when its recipient actually cashes it." Hooker v Burr, 137 California 663, 70 Pacific 778.

" 'When the check is, in fact, paid upon presentation,' say the authorities, 'the payment relates back so far as regards the extinguishment of the indebtedness to the time when the check was given.' 22 A. & E. Enc. of Law. (2d ed.) 573, and authorities there cited." Langridge v Dauenhauer, 120 Louisiana 450, 45 Southern 387.

"Generally a check becomes absolute payment of a debt when check is paid on presentation, and on such payment debt is deemed to have been discharged from date check was given." Tonnar v Wade, 121 Southern 156, (Mississippi).

"Payment by check when latter is paid relates to date of its delivery." Drukker v Howe & Company, 29 Pacific (2d) 289 (California)."

Therefore, the Board of Tax Appeals finds that the tax commissioner did not err in not including the amount of said checks as current accounts payable and in this respect the decision is hereby affirmed.

508

With reference to the second assignment of error, appellant asked permission of the tax commissioner to correct its consolidated returns by including the Seiberling Rubber Company of Canada, Ltd., which was omitted from said returns for the years 1938 and 1939, and of which company appellant owned more than 51% of the common stock. This request was denied by the tax commissioner. **Sec. 5379 GC** provides that when a consolidated return is made all the taxable property of the corporation making the return and of each of its subsidiaries shall be listed and assessed in the name of the separate owners thereof, respectively. In the case of **Proctor & Gamble Company v Evatt, 142 Oh St 373**, it was held:

"Where a corporate taxpayer is entitled to make a consolidated tax return as authorized by §5379 GC, but in making such return by mistake omits some of its subsidiaries in which it owns 51 per cent or more of the common stock, it is entitled to amend its return so as to include all of its qualified subsidiaries and thereby comply with the statute."

The Board of Tax Appeals, therefore, finds that the tax commissioner erred in this respect and the decision of the tax commissioner denying appellant the right to correct its returns to include therein the Seiberling Rubber Company of Canada, Ltd. is hereby reversed and this cause is remanded to the tax commissioner for further proceedings in accordance with the above findings.

It is, therefore, considered that the decision of the tax commissioner be, and the same is hereby, modified as above set forth, and as so modified the same is affirmed.